IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

SMITH V. GREENWALT

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KARREN SMITH, NOW KNOWN AS KARREN BENTLEY, APPELLANT,

V.

DUSTIN GREENWALT, APPELLEE.

Filed January 2, 2024.    No. A-23-145.

Appeal from the District Court for Douglas County: TODD O. ENGLEMAN, Judge. Affirmed as modified.

Haley L. Cannon and Brent M. Kuhn, of Brent Kuhn Law, for appellant.

Kristina B. Murphree and John Andrew McWilliams, of Gross Welch Marks Clare, P.C., L.L.O., for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Karren Smith, now known as Karren Bentley, appeals from the order of modification entered by the district court for Douglas County in this paternity action between Karren and Dustin Greenwalt. For the reasons set forth herein, we affirm the court's order of modification relating to custody and attorney fees, however, we modify Karren's child support obligation as set forth in the attached child support worksheet.

## II. STATEMENT OF FACTS

### 1. PARTIES

Dustin and Karren are the parents of a girl born in 2016 and a boy born in 2018. The parties were not married but resided together with the children until the summer of 2020. Karren and the

- 1 -

children moved to Omaha, Nebraska, in November 2020 and began living with Jared Bentley. Karren and Jared were married in June 2021. Dustin lives in Grand Island, Nebraska, and resides with his mother.

## 2. PATERNITY DECREE

After Karren filed a paternity action, the parties negotiated a settlement agreement, and they each testified to the terms of the agreement in court. The details of the agreement are reflected in the paternity decree and parenting plan entered by the district court on March 1, 2022. In the decree, the court specifically found that neither parent was an unfit parent. The court also found that both parties were fit and proper persons to have care, custody and control of their minor children. The court awarded the parties joint legal custody and Karren sole physical custody of the children. The decree provided that the children were to reside with Karren in Omaha during the school year and primarily with Dustin during the summer, subject to each parent's designated parenting time. The parenting plan provided that during the school year, Dustin had parenting time every other weekend from 5:45 p.m. on Friday until 5 p.m. on Sunday. The plan also provided that Dustin could exercise parenting time in Omaha every Wednesday from "after school," or 2 p.m. if school was not in session, until 7 p.m. The parenting schedule was reversed during the summer break from school, with the children residing primarily with Dustin and Karren having parenting time every other weekend and every Wednesday (in Grand Island from 2 p.m. until 7 p.m.). The parenting plan provided that parenting time exchanges (other than Wednesday night parenting time) were to occur at a gas station on the western edge of Lincoln, Nebraska. The child support worksheet attached to the decree utilized income of $7,280 for Karren and $5,425 for Dustin and calculated Dustin's child support obligation for two children as $915 and for one child as $681. The decree provided, however, that as Karren resided in Omaha and Dustin resided in Grand Island, it was reasonable to deviate from the child support guidelines. The court ordered Dustin to pay child support of $549 for two children and $400 for one child. Both parties signed the decree before a notary, verifying that the statements in the decree were true and that they agreed to all the terms set forth therein.

## 3. MODIFICATION PROCEEDINGS

### (a) Pleadings

On March 25, 2022, Dustin filed a complaint to modify the decree. He alleged the occurrence of a material change in circumstances since entry of the decree warranting a modification of custody. He sought an order awarding him sole legal and sole physical custody of the children and such other and further relief as the district court deemed just and equitable.

Karren filed an answer and "counter complaint" for modification on September 8, 2022. She alleged a material change in circumstances due to Dustin's "wrongful conduct" since the entry of the decree. She sought modification of the decree to award her sole legal custody and an updated parenting plan delineating the rights and obligations of the parties. She also asked that Dustin be ordered to pay a reasonable sum toward her attorney fees and costs.

On October 31, 2022, Dustin filed an application for contempt, alleging Karren's interference with his parenting time on the weekend of September 23-25.

## (b) Temporary Motions and Orders

On July 15, 2022, Karren filed a motion for ex parte order, seeking suspension of Dustin's parenting time and asking that she be awarded temporary sole legal and physical custody of the children. Also on July 15, she filed a motion for temporary order, seeking temporary suspension of Dustin's custody and parenting time.

At a hearing on July 20, 2022, Karren's attorney indicated that the district court had declined to enter an order suspending the parenting time based upon the affidavits that were submitted in support of Karren's ex parte motion, but that the court had indicated "this matter . . . could be taken up in the form of a temporary hearing." Karren's attorney offered three affidavits in support of Karren's temporary motion; the court indicated that it had reviewed the affidavits, but they were not marked as exhibits and included in our record on appeal. After hearing arguments from the parties' attorneys, the court stated that it was "denying the motion at this point." Our record does not contain any written orders ruling on either of Karren's motions.

On July 21, 2022, Dustin filed a motion for temporary custody and support, seeking temporary sole physical custody of the children, reducing Karren's school year parenting time to every other weekend from 5 p.m. Friday until 5 p.m. Sunday, and temporarily amending child support accordingly.

The district court heard Dustin's motion for temporary custody and support on August 2, 2022. The court entered a temporary order on August 9, awarding Dustin temporary sole legal custody for health care decisions for the children "[e]ffective immediately." The court ordered that Karren was not to take the children to any medical or mental health provider without the express written consent of Dustin or upon further order of the court. Finally, the court ordered that the parties were to continue to share joint legal custody "regarding all other parenting matters, including but not limited to education," and it denied all other requests in Dustin's motion.

## (c) Trial

Trial on the parties' modification complaints and Dustin's application for contempt was held before the district court on November 9-10 and December 5-6, 2022. The court heard testimony from numerous witnesses including the parties, Jared, Dustin's mother and brother, a friend of Dustin's who facilitated the transfer of the youngest child from day care to Dustin on Wednesdays, a day care provider, a physician's assistant (PA) who provided medical care for the children, a school nurse at the oldest child's school, and two Department of Health and Human Services (DHHS) workers who investigated allegations of abuse made by Karren. The court received voluminous exhibits including medical records for the children, DHHS records, a police report, communications between the parties, proposed child support calculations, attorney fee affidavits, Karren's pay stubs from her current employment, and information about her current work benefits. The record is large, and while we have reviewed it in its entirety, we only briefly outline the timeline and evidence regarding the allegations of abuse raised in this case. We have set forth additional evidence as necessary in the analysis section below.

The basis for the material change in circumstances alleged by Dustin in his complaint for modification was the repeated claims by Karren and Jared that Dustin was subjecting the children to sexual and physical abuse. The evidence shows that Karren made repeated claims of such abuse both before and after entry of the decree, none of which were ever substantiated. Dustin testified

at trial that given the parties' negotiated settlement, he believed Karren was in agreement with the custody arrangement and parenting plan set forth in the decree and would stop making unfounded claims of abuse. She did not. The evidence at trial showed that following entry of the paternity decree on March 1, 2022, the children were subjected to invasive medical examinations and questioned by medical providers, DHHS personnel and/or law enforcement personnel on multiple occasions.

Following entry of the decree, Dustin had parenting time with the children during the oldest child's spring break from school. On March 17, 2022, during this extended visit, the children and Dustin were interviewed by DHHS and law enforcement personnel based on a complaint made by Karren. The children were interviewed at the Child Advocacy Center and released back to Dustin's care.

Dustin returned the children to Karren on March 20, 2022. That night, Karren took the youngest child to the emergency room, claiming that Dustin had pushed the child down the stairs. The medical examination of the child was normal.

On March 21, 2022, Karren took the oldest child to an immediate care clinic where she was seen by a PA for vaginitis. In the child's presence, Karren made allegations to the PA of sexual abuse of the child by Dustin. The PA performed a physical examination of the child's genital area and prescribed over-the-counter medication for vaginitis. There was no evidence at trial to substantiate these abuse allegations, and DHHS took no action related to the report of this alleged abuse.

On March 24, 2022, Karren took the oldest child to another PA for a follow-up on the vaginitis diagnosis and again made allegations of sexual abuse. This PA also performed an examination of the child's genital area. While the child was on the examination table, the PA asked whether anyone had touched her; the child responded that Dustin had touched her, under her clothes. The PA found nothing out of the ordinary during her examination, although she reported the allegations of abuse. The medical records admitted at trial and the PA's trial testimony contradicted Karren's testimony about this incident.

On March 27, 2022, after receiving the children back from Dustin's next weekend of parenting time, Karren took the youngest child to the emergency room with allegations of sexual abuse by Dustin. While Karren was there, Jared called her and informed her of a similar allegation by the oldest child, after which Jared brought the oldest child to the emergency room. The children both underwent physical examinations and were questioned by a social worker. The record does not show any DHHS actions or charges resulting from this incident.

On April 10, 2022, Karren took both children to the emergency room and reported that Dustin had sexually abused both children. Both children were subjected to physical examinations and again interviewed by social workers. The medical records show that Karren was observed asking one of the children questions about what happened and had to be redirected by the social worker that investigative workers would question the children.

Karren took the children to the emergency room again on April 24, 2022, with allegations that Dustin had sexually abused the children and had filmed the oldest child while doing so. The children were examined; no evidence of abuse was found.

On June 24-25, 2022, Karren took the children to the emergency room with complaints of physical and sexual abuse of the youngest child and physical abuse of the oldest child by Dustin.

Both children were examined, and the medical records reflect that the children did not have any injuries consistent with physical or sexual abuse.

Then on October 25, 2022, the oldest child was seen by the school nurse for a fever. When Jared came to pick the child up from school, he shared, without prompting by the nurse, multiple allegations of sexual abuse. The nurse reported the allegations, but the resulting DHHS investigation did not result in any finding of abuse.

### (d) Modification and Contempt Orders and Post-Trial Proceedings

The district court entered an order of modification on December 30, 2022, modifying custody by awarding Dustin sole legal and physical custody of the children subject to Karren's parenting time, ordering Karren to pay child support of $744 per month, and finding Karren in contempt of court for willfully interfering with Dustin's parenting rights. Karren timely filed a motion to alter or amend and/or motion for new trial. Among other things, she alleged that the district court's rulings as to modification and contempt should have been entered as separate orders "for material procedural reasons." On January 27, 2023, the court entered an order granting Karren's request to separate the modification and contempt rulings into separate orders, but it denied the claim that the court's December 2022 order was not sustained by sufficient and competent evidence and was contrary to Nebraska law and the claim that the evidence presented at trial did not amount to a material and substantial change in circumstances warranting a modification of the decree. On January 30, the court entered an amended modification order and a separate order of contempt.

In the amended modification order, the district court made extensive findings with respect to the evidence presented at trial, which we do not repeat here, except to note the court's determination that the allegations made by Karren and Jared as to Dustin's physical and sexual abuse of the children were not supported by the medical evidence presented at trial. We also note the court's determination that there were "glaring and obvious inconsistencies in the testimony of [Karren and Jared]," which the court found "at times to be purposely evasive, vague and at times, wholly inaccurate and misleading." After an extensive discussion of the evidence at trial, the court stated:

> When making this finding, the [c]ourt made its finding based on the direct testimony provided at trial, and the near complete lack of any physical evidence adduced by [Karren] to substantiate her actions. The [c]ourt considered the medical records as merely corroborative and duplicative evidence in favor of the [c]ourt's independent finding based on the testimony of all the witnesses and judging the credibility of the witnesses at trial.

> Notwithstanding the medical records, the [c]ourt finds based on the testimony provided at trial and judging the credibility of the witnesses that there was more than sufficient grounds to find a material change in circumstances based on the actions of [Karren] and [Jared] and would find that [Karren] is unfit to be awarded sole legal or sole physical custody of the minor children and that it is not in the minor children's best interest for either legal or physical custody to remain with [Karren].

The district court denied Karren's request to be awarded sole legal custody, finding it was not in the children's best interests for her to have sole legal custody. "[E]ffective immediately," the court awarded Dustin sole legal and sole physical custody of the children. In the attached parenting plan, the court awarded Karren parenting time every other weekend from 6 p.m. Friday until 6 p.m. Sunday, with the parenting time exchange to occur at a gas station in York, Nebraska. The parenting plan also provided that Karren "may, at her discretion," exercise parenting time in Grand Island every Wednesday from the beginning of August until the end of June from "after school" (2 p.m. if school was not in session) until 7 p.m. Karren was to provide all transportation for the Wednesday parenting time. The parenting plan provided that Karren was to have one month of summer parenting time, with Dustin having parenting time on alternating weekends and the option to exercise Wednesday after school parenting time in Omaha. Again, weekend parenting time exchanges were to take place in York, and Dustin was to provide all transportation for Wednesday parenting time.

The district court found that the parties' income had materially changed since entry of the decree, and it modified child support, ordering Karren to pay child support to Dustin. As set forth in the child support worksheet attached to the court's modification order, Karren's child support obligation for two children should have been $1,195 and $846 for one child. The amended modification order did not reflect any deviations from the calculated amounts.

Finally, the district court ordered Karren to pay Dustin $10,000 in attorney fees "[d]ue to the continued and habitual nature of [Karren's] actions in this case."

Karren subsequently perfected her appeal to this court.

## III. ASSIGNMENTS OF ERROR

Karren assigns, consolidated and restated, that the district court abused its discretion in (1) modifying the paternity decree to award sole legal and sole physical custody of the children to Dustin, (2) violating Karren's substantial rights by prejudging witnesses and punishing Karren for reporting suspected child abuse and neglect, (3) failing to consider Karren's contributions to retirement and health insurance premiums and failing to award an abatement and deviation in child support, (4) awarding attorney fees to Dustin.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021). When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Id.*

An award of attorney fees in a paternity action is reviewed de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Kee v. Gilbert*, 32 Neb. App. 1, 992 N.W.2d 486 (2023). Absent such an abuse, the award will be affirmed. *Id.*

## V. ANALYSIS

### 1. MODIFICATION OF CUSTODY

Karren assigns that the district court abused its discretion in modifying the paternity decree to award sole legal and sole physical custody of the children to Dustin. She argues that the court abused its discretion in finding that a material change in circumstances had occurred after entry of the previous custody order and that the court's modification of legal and physical custody was in the children's best interests. She also argues that the court abused its discretion in finding that she was an unfit parent.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Scott v. Dorrance*, 32 Neb. App. 213, 995 N.W.2d 226 (2023). Modifying a custody or parenting time order requires two steps of proof. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

### (a) Material Change in Circumstances

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id.*

Karren argues that the evidence presented at trial does not support finding a material change in circumstances since the entry of the decree. She argues that the district court and the parties were all aware of the allegations of abuse of the children by Dustin made by Karren and her interference with his parenting time that began prior to entry of the decree.

In the amended modification order, the district court determined that although Karren's allegations of child abuse began during the initial paternity proceedings, such actions by Karren and Jared continued beyond entry of the stipulated decree and even after the court modified temporary legal custody, as evidenced by Jared's interactions with the school nurse in October 2022. The court noted Dustin's testimony that he thought Karren would stop making unfounded allegations of abuse against him and that the parties would be able to co-parent based on their stipulated custody arrangement and parenting plan adopted by the court in the decree. The court also noted Dustin's testimony that he was unaware of the extent of the post-decree allegations Karren had made against him and the number of times she had taken the children for medical examinations following entry of the decree until the summer of 2022 when Karren filed her ex parte motion for suspension of his parenting time. The court found the evidence clear that rather than stopping her behavior upon entry of the stipulated decree, Karren and Jared "stepped up their claims by taking the minor child [sic] in for multiple invasive physical examination[s], in front of

multiple and different medical care providers, even in the face of zero medical evidence indicating any type of physical or sexual abuse being present." The court found that the Karren's actions "in taking these minor children in for invasive physical and mental [sic] examinations based on her allegations of child abuse a total of 4 times, to 3 different medical providers in the time span of 3 weeks shows a consistent and habitual pattern" on Karren's part, which the court found to be "harmful, excessive and unwarranted by the lack of all physical evidence" and not in the children's best interests. The court concluded that Dustin met his burden of proving a material change in circumstances had occurred since entry of the decree that was not anticipated at the time the decree was entered.

We acknowledge that a very short time elapsed between the entry of the paternity decree and Dustin's complaint for modification. Often it would be difficult to prove a change in circumstances in such a short period of time. However, as noted by the district court, Dustin entered into the agreement with the belief that Karren's past actions of reporting abuse would cease. At the time of the decree, Karren stipulated that Dustin was a fit parent, and she agreed to his rather liberal parenting time without any restrictions. Her actions, which began very shortly after the agreement and entry of the decree, clearly show a change in circumstances. We find no abuse of discretion in the court's determination that a material change in circumstances had occurred.

### (b) Best Interests

Karren argues that the district court abused its discretion in finding that it was in the children's best interests to modify the decree to award Dustin sole legal and sole physical custody of the children.

"Legal custody means the authority and responsibility for making fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(13) (Cum. Supp. 2022). "Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." § 43-2922(20).

With respect to best interests, Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

- 8 -

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

In finding that modification of both legal and physical custody was in the children's best interests, the district court emphasized the evidence of Karren and Jared's unsubstantiated allegations of sexual and physical abuse of the children by Dustin. The court noted "the glaring and obvious inconsistencies" in the testimony provided by Karren and Jared, which the court found at times "purposely evasive, vague" and at times "wholly inaccurate and misleading." The court found that their testimony was "directly contradicted on numerous occasions and refuted on multiple occasions" by the testimony of medical personnel, DHHS workers, and the medical reports received at trial. The court determined that there was no testimony provided by any DHHS worker or medical professional which "validated, confirmed or substantiated that [Dustin] was perpetrating any type of physical or sexual abuse upon these minor children." The court expressed concern about the effect of repeated invasive medical examinations on the children, especially in light of the lack of evidence to support Karren's claims. The court also noted evidence of the parties' inability to communicate effectively and Karren's demonstrated unwillingness to co-parent with Dustin.

The evidence was in conflict, and we consider and give weight to the fact that the district court heard and observed the witnesses and accepted Dustin's version of the facts rather than Karren's. See *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021). Upon our de novo review, we find no abuse of discretion in the court's determination that it was in the children's best interests to modify the decree to award sole legal and sole physical custody of the children to Dustin.

(c) Unfitness

Karren also argues that the district court abused its discretion in finding that she was unfit to have sole legal and sole physical custody of the children. As noted above, ordinarily, custody of a minor child will not be modified absent a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. See *Scott v. Dorrance*, 32 Neb. App. 213, 995 N.W.2d 226 (2023). The disjunctive use of the word "or" in that proposition demonstrates that a material change in circumstances does not require a finding of unfitness. Because we have already found that the court did not abuse its discretion in finding a material change in circumstances showing that modification of custody was in the children's best interests, we do not need to address Karren's arguments with respect to the court's finding of unfitness. An appellate court is not obligated to engage in an analysis that is not needed to adjudicate the controversy before it. *Brush & Co. v. W. O. Zangger & Son*, 314 Neb. 509, 991 N.W.2d 294 (2023).

## 2. JUDICIAL BIAS

Karren assigns that the district court abused its discretion in violating her substantial rights by prejudging witnesses and punishing her for reporting suspected child abuse and neglect. Her arguments are addressed to statements made by the court during the July 20, 2022, hearing on her motion for temporary suspension of Dustin's custody and parenting time and a portion of the court's August 2022 temporary order ruling on Dustin's motion for temporary custody and support, as well as on the court's modification of custody following trial.

### (a) Statements During July 2022 Temporary Hearing

In connection with the first portion of this assigned error, Karren notes comments made by the district court during the July 2022 temporary hearing. She argues that the court's remarks show bias and affected her right to a fair and impartial trial.

The parties were represented by counsel at the July 2022 hearing. Dustin was present; Karren was not. When the district court inquired why Karren was not present, her attorney explained that Karren had "a work commitment." Karren's attorney offered affidavits in support of Karren's motion (two affidavits from Karren and one affidavit from a medical provider who saw the oldest child on March 24, 2022). The court indicated that it had the affidavits and had reviewed all of them, but the affidavits were not made part of the record on appeal. The court then heard argument from the attorneys.

During the course of the July 2022 hearing, the district court noted certain details of the affidavits before it with respect to events in March 2022. The court then stated:

> So I have a little girl who heard mom say this to a PA three days before, and now I've got a PA saying three days later, daughter says that to her but there's not medical records from this woman March 24th. I'm this close with your client. She takes her child in to see somebody on March 21st, and I think from everything I'm looking at, doesn't get what she wants. Takes her to another PA three days later. And there's no record of that attached to her affidavit. As to what went on in that interview. So literally two weeks after I entered this paternity Order she takes the kid to a PA to have her investigated for sexual assault again. . . .

The court concluded this portion of its remarks by asking why Karren took the oldest child to different medical providers on March 21 and March 24.

After a comment by Karren's attorney, the district court stated:

> This child has gone through sexual assault evaluations at least three times since I've been in this case. That is appalling. For a five year old. I can't believe anything this five year old says now because she has been interviewed so many times, so many different times, by so many different people. I don't think I can believe anything she says. As a reporter. Because she's been through this so many times. . . . [Karren] tells them she has full legal custody. She doesn't have full legal custody, she has joint legal custody. These are all concerning things to me. And you haven't been in this case [Karren's attorney], so forgive me my frustration with your client. Which is why I wanted to know if she's here.

- 10 -

The discussion then turned to prior issues in the case with respect to Jared's involvement in the children's medical care and restrictions put in place by the district court to limit Jared's involvement "because he was injecting himself in everything." During this portion of the discussion between the court and the parties' attorneys, the court stated, "I don't believe anything from [Jared]. I don't find him credible at all." The court then referenced further statements in one of Karren's affidavits as to her concerns with respect to the youngest child.

After further discussion between the district court and the attorneys about the issues before the court in the July 2022 hearing and the evidence presented in support of Karren's motion, the court stated:

> And that's my concern is that these kids are being hauled away and interviewed by law enforcement. Interviewed by nurses. Taken to PA's. Taken to another PA. Taken to a counselor. These kids are going to be so messed up that they are not going to be able to say what's up and what's down at this point.
>
> I don't think that [the children] are credible people to give any kind of history because they've been through so much. They don't know what's been told to them, what's been asked of them or what's true. And I mentioned this to [Karren] last year. That I warned her that what she is doing is verging on child abuse by continually taking these children and having them interviewed. Which is my guess why she didn't take them. To have them interviewed forensically again.
>
> Because last time it was [Jared], who took the child in. He has absolutely no legal right to anything of that child and he took her in to have [a] forensic interview performed on her. Which is why I entered my Order that he is not to be anywhere near this child[']s medical care. He is not a parent. He has no legal rights to this child, and he is taking it in for her [sic] a forensic sexual assault interview. I really wish [Karren] was here, because I have a lot of questions for her. But I have a feeling that we are probably going to be dealing with this in the temp hearing [on Dustin's motion] coming up in the next couple of weeks.
>
> I don't know what I'm going to do. I'm not granting the motion at this point. Everything is staying the way that it is. There's no emergency here.

The court concluded its remarks by stating that it was denying Karren's motion "at this point."

On appeal, Karren challenges the district court's impartiality and essentially argues that she was denied due process at the modification trial by virtue of the court's remarks at the July 2022 temporary hearing. Generally, procedural due process requires parties whose rights are affected by a proceeding to be given timely notice, which is reasonably calculated to inform the person concerning the subject and issues involved in the proceeding; a reasonable opportunity to refute or defend against a charge or accusation; a reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the constitution or statute; and a hearing before an impartial decisionmaker. *Hudson v. Hudson*, 31 Neb. App. 630, 988 N.W.2d 179 (2023).

The Nebraska Revised Code of Judicial Conduct states that a judge shall recuse himself or herself from any proceeding in which the judge's impartiality might reasonably be questioned, including when the judge has a personal bias or prejudice concerning a party or a party's lawyer. *Timothy L. Ashford, PC LLO v. Roses*, 313 Neb. 302, 984 N.W.2d 596 (2023). To demonstrate

- 11 -

that a trial judge should have recused himself or herself, the moving party must show that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown. *Id.* One seeking to disqualify a judge on the basis of bias or prejudice bears the heavy burden of overcoming the presumption of judicial impartiality. *Id.*

A party is said to have waived his or her right to obtain a judge's disqualification when the alleged basis for the disqualification has been known to the party for some time, but the objection is raised well after the judge has participated in the proceedings. *Thompson v. Millard Pub. Sch. Dist. No. 17*, 302 Neb. 70, 921 N.W.2d 589 (2019). The issue of judicial disqualification is timely if submitted at the earliest practicable opportunity after the disqualifying facts are discovered. *Id.*

Karren did not seek recusal of the trial judge at any point during the modification proceedings, and she does not argue on appeal that the judge should have been recused. Rather, she argues that in making the comments noted above about credibility during the course of the July 2022 temporary hearing, the district court made determinations prior to trial about the credibility of Karren and Jared as well as the credibility of any testimony by medical or law enforcement personnel with respect to any statements made by the parties' oldest child. Karren argues that we should consider this "prejudgment" by the court in determining how much weight to give the court's credibility determinations following the modification trial. Brief for appellant at 26.

Karren asserts that the district court's comments at the July 2022 hearing "were not related to any evidence being presented in the case." *Id.* We disagree. Having reviewed the entirety of the bill of exceptions from the July 2022 temporary hearing, as well as the entirety of the record on appeal, we view the district court's comments at the July 2022 hearing as relating to the evidence before it at the time of that hearing. The court made it clear that it had reviewed all of the evidence presented in support of Karren's motion and asked the attorneys questions based upon its review of that evidence. While the court expressed frustration that Karren was not personally present to answer questions about the evidence presented in support of her motion, we do not view the court's comments as a prejudgment of the issues presented by the parties' requests for modification. In fact, the court specifically stated, as noted above, "I don't know what I'm going to do," before going on to state that it was denying Karren's temporary motion "at this point." Karren has not shown that the court's comments at the July 2022 temporary hearing led to a denial of her due process rights at the modification trial. This portion of Karren's assignment of error fails.

### (b) Temporary Legal Custody for Health Care Decisions

On August 9, 2022, following the hearing on Dustin's motion for temporary custody and support, the district court awarded Dustin temporary sole legal custody of the children for health care decisions and in conjunction with that temporary modification, ordered Karren not to take the children to any medical or mental health provider without Dustin's express written consent or further order of the court. The court denied all other requests in Dustin's temporary motion and specified that the parties would continue to share joint legal custody regarding all other parenting matters. Following the modification trial, the court modified the paternity decree to award Dustin sole legal and sole physical custody of the children.

Karren first argues that the district court's temporary modification of legal custody for health care decisions and the restriction in the August 2022 temporary order requiring her to obtain

Dustin's express written consent to take the children to medical or mental health care providers inappropriately limited her reporting of suspected child abuse and neglect. She argues further that the court's award of custody to Dustin in the January 2023 amended modification order punished her for her past reporting of child abuse and neglect.

Karren relies on an unpublished case from this court, *Kelly v. Kelly*, No. A-20-364, 2021 WL 456034 (Neb. App. Feb. 9, 2021) (selected for posting to court website). In that case, the parents were awarded joint legal and physical custody of their child at the time of their divorce. Subsequently, both parents sought modification of the custody provisions of the divorce decree. The evidence at the modification trial showed that the mother had a history of reporting allegations of abuse against the father to law enforcement or other agencies, which had proven to be unfounded. The trial court modified the decree to give the father final decisionmaking authority and amended the parenting plan to provide that the mother was not to report to law enforcement or other agencies any alleged acts of abuse by the father against the child without first obtaining permission of the trial court.

On appeal, the mother challenged the trial court's award of final decisionmaking authority to the father. This court found no abuse of discretion, observing that the parties clearly had a fundamental difference of opinion as to whether the child had been subjected to abuse or trauma and what treatment would be in her best interests. We concluded that awarding final decisionmaking authority to one party was necessary due to the parents' inability to agree on those issues.

In *Kelly*, the mother also assigned error to the limitation on her reporting of alleged acts of abuse. She argued that the limitation was contrary to the child's best interests and violated Neb. Rev. Stat. § 28-711(1) (Reissue 2016) (making it mandatory for person who has reasonable cause to believe child has been subjected to child abuse or neglect to report to law enforcement agency). The mother also argued that the reporting limitation in the parenting plan subjected her to criminal penalties under Neb. Rev. Stat. § 28-717 (Reissue 2016) (person who willfully fails to make report of child abuse or neglect required by § 28-711 shall be guilty of Class III misdemeanor). This court questioned the trial court's authority to limit the ability of a parent to report further concerns of abuse, finding that such a limitation appeared to run afoul of § 28-711 and be contrary to the child's best interests. Accordingly, we reversed and remanded the case to the trial court with directions to remove that provision from the modified parenting plan. In doing so, we noted that the parenting plan did allow each parent to make emergency decisions affecting the health or safety of the child while the child was in his or her physical custody. We also noted that the provision of final decisionmaking authority to the father regarding the child's medical needs should reduce the risk of unnecessary examinations of the child.

In the present case, the provision in the district court's August 2022 temporary order on Dustin's pretrial motion is distinguishable from the provision in the modification order in the *Kelly* case. Here, the court did not impose any limitation on Karren's ability to report suspected abuse or neglect in the amended order of modification. The court did award Dustin sole legal custody, which should reduce unnecessary examinations of the parties' children. We note that the amended parenting plan does include a provision allowing either parent to authorize emergency medical procedures in situations affecting the immediate health of each child. Finally, we disagree with Karren's assertions that the court's modification of custody was a punishment for her past

reporting of suspected child abuse. As discussed above, the court did not abuse its discretion in finding a material change in circumstances or in finding that modification legal and physical custody was in the children's best interests. This portion of Karren's assignment of error fails.

### 3. Modification of Child Support

Karren assigns that the district court erred and abused its discretion in failing to consider her contributions to retirement and health insurance premiums and failing to award an abatement and deviation in child support. In the amended modification order, the court found that the parties' incomes had materially changed since entry of the decree. Based on that finding and its change in custody of the parties' children, the court ordered that Dustin's obligation to pay child support cease and that Karren pay child support to Dustin. The child support worksheet attached to the court's order utilizes the figures in the proposed worksheet offered by Dustin at trial, and it reflects that Karren's final share of the total child support obligation was $1,195 for two children and $846 for one child (Dustin's final share was $744 for two children and $497 for one child).

A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Kotas v. Barnett*, 31 Neb. App. 799, 990 N.W.2d 37 (2023). The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Id.* Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Id.*

#### (a) Plain Error

We first address an issue of plain error noted by Dustin. In the body of the amended modification order, the district court ordered Karren to pay child support to Dustin, but in setting forth the specific amounts she was ordered to pay for two children and one child, the court inadvertently listed the amounts of Dustin's obligation ($744 for two children and $497 for one child). Accordingly, we modify the court's order to reflect that Karren is ordered to pay child support as calculated based on this court's analysis below and our calculation set forth in appendix A.

#### (b) Retirement Contributions

The Nebraska Child Support Guidelines provide that certain deductions, including retirement contributions, should be annualized to arrive at monthly net income. Neb. Ct. R. § 4-205 (rev. 2016). With respect to retirement, the guidelines provide for the deduction of "Individual contributions, in a minimum amount required by a mandatory retirement plan. Where no mandatory retirement plan exists, a deduction shall be allowed for a continuation of actual voluntary retirement contributions not to exceed 4 percent of the gross income from employment or 4 percent from the net income from self-employment." § 4-205(C).

Karren is a software engineer. On April 4, 2022, she began working for a different company than the one where she was employed at the time the decree was entered. At the time of the modification trial, she was working Monday through Friday, from 8:30 a.m. to 5:30 p.m., earning $100,000 per year. She testified that her current employer takes "[e]ight percent" out of her paycheck for purposes of retirement.

In its child support calculation, the district court did not include any deduction for Karren's retirement contribution. The parties agree that the court should have included a deduction of $333.33 for Karren's retirement contribution (which is 4 percent of her monthly gross income of $8,333.33). The court's child support calculation should be modified accordingly.

### (c) Health Insurance Premiums

The child support guidelines also allow a deduction for the cost of a parent's own health insurance as follows:

> A deduction shall be allowed for the monthly out-of-pocket cost to the parent for that particular parent's health insurance. This includes the cost of coverage for the parent only. It does not include the cost of health insurance for the child(ren), which is addressed in § 4-215(A). The parent requesting the deduction must submit proof of the cost actually incurred for health insurance coverage of the parent. The amount of the deduction for the cost to the parent for health insurance for himself or herself shall not exceed 5 percent of that parent's gross income.

§ 4-205(F). And, with respect to children's health insurance, Neb. Ct. R. § 4-215(B) (rev. 2020) provides that "[c]hildren's health care needs are to be met by requiring either parent to provide health insurance as required by state law." Subsection (A) provides, among other things, that the parent paying the children's health insurance premium, is to receive a credit against his or her share of the monthly support. § 4-215(A).

At the time of trial, the parties both had health insurance through their work for the children as well as for themselves. The record shows that Karren's health insurance premium per month for herself is $287.60 and for the children is $239.29. The record shows that Dustin's health insurance premium per month for himself starting January 1, 2023, is $145.21 and for the children is $99.40.

The district court ordered that commencing January 1, 2023, Dustin was to cover the minor children on his policy of health insurance available through his employer as long as it continued to be reasonably available. In its child support calculation, the court included a deduction of $147.55 for Dustin's health insurance premium for himself and a credit of $99.40 for Dustin's health insurance premium for the children. It did not include any health insurance deduction or credit for Karren. The figures used by the court correspond to those used in the proposed calculation submitted by Dustin at trial (he testified that his proposed calculation reflected his actual income and the contributions he was then making to health insurance).

The district court's calculation of child support should include a deduction of $287.60 for Karren's monthly health insurance premium for herself. Because she is not required to provide health insurance coverage for the children, the court did not err in failing to include a credit for Karren's payment of a health insurance premium for the children.

(d) Abatement and Deviation

With respect to parenting time adjustments, the child support guidelines provide:

[A]n adjustment in child support may be made at the discretion of the court when visitation or parenting time substantially exceeds alternating weekends and holidays and 28 days or more in any 90-day period. During visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent. The amount of any reduction for extended parenting time shall be specified in the court's order and shall be presumed to apply to the months designated in the order. Any documented substantial and reasonable long-distance transportation costs directly associated with visitation or parenting time may be considered by the court and, if appropriate, allowed as a deviation from the guidelines.

Neb. Ct. R. § 4-210.

At the time of the decree and throughout these modification proceedings, Karren has resided in Omaha and Dustin has resided in Grand Island. In the original decree, Karren was awarded primary physical custody of the children during the school year, and Dustin had parenting time on alternating weekends and could also exercise parenting time for a specified period of time in Omaha on Wednesdays after school. Parenting time exchanges, other than Wednesday nights, took place on the western edge of Lincoln. During the summer break from school, the parenting time schedule was reversed, with the children residing primarily with Dustin and Karren having parenting time every other weekend and on Wednesday evenings in Grand Island. The stipulated decree found a deviation from the child support calculation in the attached worksheet "reasonable" because "[Karren] resides in Omaha and [Dustin] resides in Grand Island." The court ordered Dustin to pay monthly child support of $549 for two children and $400 for one child (deviating from the amounts of $915 and $681 reflected in the attached worksheet).

In the amended order of modification, Dustin was awarded sole physical custody of the children. Karren was given parenting time every other weekend and had the option to exercise Wednesday evening parenting time in Grand Island. Parenting time exchanges other than Wednesday evenings were to occur in York. Karren was responsible for transporting the children for Wednesday evening parenting time. During the summer, Karren was to have one month of regular parenting time. During Karren's month of summer parenting time, Dustin was to have parenting every other weekend, and had the option to exercise Wednesday evening parenting time in Omaha.

The record does not show that Karren raised at trial the issue of an abatement in her child support based upon any extended period of summer parenting time or a deviation based upon her travel expenses in the event the district court granted Dustin's request for modification. And, once the court entered the initial modification order, awarding custody to Dustin, ordering Karren to pay child support, and awarding Karren parenting time as described above, she did not raise the issue of an abatement of child support during her summer parenting time or a deviation based upon travel expenses in her motion to alter or amend or during the hearing on that motion. One cannot silently tolerate error, gamble on a favorable result, and then complain that one guessed wrong. *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021). An appellate court will not

- 16 -

consider an issue on appeal that was not presented to or passed upon by the trial court. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022). We decline to consider this issue further.

### (e) Modified Child Support Calculation

Because Karren should have received deductions for her retirement contribution and her personal health insurance premium, we have modified her child support according to the analysis above and have completed a child support calculation worksheet consistent with our findings. This child support worksheet with our de novo calculation is attached to this opinion as appendix A.

### 4. AWARD OF ATTORNEY FEES

Karren assigns that the district court abused its discretion in awarding attorney fees to Dustin. At trial, the court received the attorney fee affidavit offered by Dustin, reflecting his attorney fees of $16,242.50 as of November 6, 2022. The court ordered Karen to pay $10,000 of Dustin's attorney fees, "[d]ue to the continued and habitual nature of [her] actions in this case."

Attorney fees may be recovered in a civil action only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *BCL Properties v. Boyle*, 314 Neb. 607, 992 N.W.2d 440 (2023). Attorney fees and costs are statutorily allowed in paternity and child support cases. *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019).

Customarily, attorney fees and costs are awarded only to the prevailing party or assessed against those who file frivolous suits. *Wolter v. Fortuna, supra*. The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Clearly, Dustin was the prevailing party. Upon our review of the record, we find no abuse of discretion in the district court's award of attorney fees in this case.

### VI. CONCLUSION

The district court did not abuse its discretion in its modification of custody or the award of attorney fees. The court did err in not including deductions for Karren's retirement contribution and her personal health insurance in the child support calculation. We modify Karren's child support obligation as set forth in the attached child support worksheet. The decree is affirmed in all other respects.

AFFIRMED AS MODIFIED.

## Appendix A

Case Name: <u>Smith v. Greenwalt, CI 20-10169</u>
Worksheet 1 - Basic Income and Support Calculation

Karren: Single / 2 Exemptions / Regular Employment
Dustin: Single / 2 Exemptions / Regular Employment

| Line | Description | Karren | Dustin |
|------|-------------|--------|--------|
| 1 | Gross Earned Taxable Income | $8,333.33 | $5,700.00 |
| 1 | Gross Unearned Taxable Income | $0.00 | $0.00 |
| 1 | Tax-Exempt Income | $0.00 | $0.00 |
| 2.a | Taxes - Federal | $1,188.37 | $609.04 |
| 2.a | Taxes - Nebraska | $407.01 | $232.16 |
| 2.b | FICA - Social Security / Railroad Retirement* | $516.67 | $353.40 |
| 2.b | FICA - Medicare | $120.83 | $82.65 |
| 2.c | Retirement | $333.33 | $0.00 |
| 2.d | Previously Ordered Support | $0.00 | $0.00 |
| 2.e | Regular Support for Other Children | $0.00 | $0.00 |
| 2.f | Health Insurance Premium for Parent | $287.60 | $147.55 |
| | Other Deductions | $0.00 | $0.00 |
| | Child Tax Credit | ($166.67) | ($166.67) |
| 2.g | Total Deductions | $2,687.14 | $1,258.13 |
| 3 | Net Monthly Income | $5,646.19 | $4,441.87 |
| 4 | Combined Net Monthly Income | $10,088.05 ||
| 5 | Combined Net Annual Income | $121,056.64 ||
| 6 | Each Parent's Percent | 55.97% | 44.03% |
| 7 | Monthly Support from Table (2 Children) | $1,881.00 ||
| 8 | Health Insurance Premium for Children | $0.00 | $99.40 |
| 9 | Total Obligation | $1,980.40 ||
| 10 | Each Parent's Monthly Share | $1,108.43 | $871.97 |
| 11 | Credit For Health Insurance Premium Paid | ($0.00) | ($99.40) |
| 12 | Each Parents' Final Share (2 Children, rounded) | $1,108.00 | $773.00 |

Worksheet 4 - Number of Children Calculation (final shares are rounded to the nearest whole dollar)

| No. Children | Table Amt. | Table + Health Ins. | Karren's Share of Total | Dustin's Share of Total | Karren's Final Share | Dustin's Final Share |
|--------------|-----------|---------------------|-------------------------|-------------------------|----------------------|----------------------|
| 2 | $1,881.00 | $1,980.40 | $1,108.43 | $871.97 | $1,108.00 | $773.00 |
| 1 | $1,307.00 | $1,406.40 | $787.16 | $619.24 | $787.00 | $520.00 |